UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
-------------------------------------------------------
                   :

UNITED STATES OF AMERICA,     :      CASE NO. 1:06-CR-200-002
                   :
        Plaintiff,        :
                   :
vs.                   :      OPINION & ORDER
                   :      [Resolving Doc. No. 57]
DAMON E. ALEXANDER, JR.,     :
                   :
        Defendant.     :
                   :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

With this Opinion and Order, the Court decides whether to grant Defendant Damon Alexander's ("Alexander") motion to suppress evidence of illegal drug activity seized by the police consequent to their execution of a valid search warrant, but after they coerced Alexander's cooperation in effecting the search. In its determination, the Court considers issues regarding (i) whether the Government had sufficient reasonable suspicion to pause processing a package for delivery to Defendant Alexander; (ii) whether the investigating police officers violated Alexander's *Miranda* rights; and, (iii) the applicability of the Exclusionary Rule and its exception for inevitable discovery to the facts of this case.

On April 26, 2006, the Government issued an indictment that charged Defendant Alexander with conspiracy to distribute and possession with the intent to distribute five kilograms or more of cocaine in violation of Section 2 of Title 18 of the United States Code and Sections 841(a)(1) and

Case No. 1:06-CR-200-002
Gwin, J.

(b)(1)(A) of Title 21 of the United States Code. [Doc. 10.][1/]  On October 27, 2006, Alexander filed

a motion to suppress evidence seized following the Government's controlled-delivery of cocaine and

substituted contraband to Alexander's residence. [Doc. 57.]  The Government filed its opposition

to Alexander's suppression motion on October 31, 2006. [Doc. 62.]

On November 13 and 14, 2006, the Court conducted a hearing during which it received

evidence and heard argument related to Defendant Alexander's suppression request. [Docs. 70, 71;

Trial Tr. 1-308, Nov. 13, 2006; Trial Tr. 1-49, Nov. 14, 2006.]  At the close of the hearing, the Court

requested that both sides submit supplemental briefs on the issue of inevitable discovery, which the

Government and Defendant did on November 22, 2006. [Docs. 76, 79.]

After considering the factual evidence and testimony before it, as well as each side's legal

argument, the Court **DENIES** Defendant Alexander's motion to suppress for the reasons presented

below.

## I.  Background

Alexander's motion first presents the Court with a determination regarding whether law

enforcement officials properly identified an Express Mail package for a dog-sniff test.  On April 5,

2006, Detective Gene Cook ("Cook") of the East Cleveland Police Department identified as

suspicious an Express Mail package coming from Las Vegas, Nevada and addressed to Defendant

Alexander's house in Shaker Heights, Ohio. [Doc. 62.]  Several of the package's external

characteristics aroused Detective Cook's suspicion: a "crayon"-like, large, and roughly-scrawled

"X" that allowed the package to be delivered without a receipt signature; the package's origination

---

[1/] On November 17, 2006, the Government filed a Superseding Indictment against Defendant Alexander, which adds additional counts including possession with intent to distribute and distributing cocaine and crack cocaine in violation of Sections 841(a)(1) and (b)(1)(B) of Title 21 of the United States Code and felon-in-possession of a firearm in violation of Section 922(g)(1) of Title 18 of the United States Code. [Doc. 77.]

Case No. 1:06-CR-200-002
Gwin, J.

and destination locations as known source areas of narcotics; the parcel's hand-written label, despite

purportedly coming from "Thomas & McKenzie Financial;" the absence of telephone numbers for

either the sender or the recipient; and, the weight and density of the package. [Trial Tr. 35-38, Nov.

13, 2006.] Based on these external indicia, Detective Cook removed the package from the mail line,

ran a computer check on the return address, and subjected the parcel to a "sniff test" by his

officially-trained and -certified canine partner. *Id.* at 39-41. The computer indicated the falsity of

the package's return address and the drug dog alerted to the package as containing narcotics. *Id.*

After receiving the dog's indication that the package contained illegal narcotics, Detective Cook

contacted United States Postal Inspector Martin J. Cernelich ("Cernelich") and told him that he had

interdicted a suspect package. *Id.* at 41. Approximately twenty minutes elapsed from the time

Detective Cook initially noticed the package in the mail line and his contacting Inspector Cernelich.

*Id.*

Inspector Cernelich immediately applied for and obtained a valid warrant to search the

package's contents from United States Magistrate Judge Nancy A. Vecchiarelli ("Vecchiarelli").

[Trial Tr. 187-89, Nov. 13, 2006; Gov't Exh. 6.] Pursuant to the search warrant, Inspector Cernelich

opened the package and found two bricks and a cellophane-wrapped bundle containing chunky white

powder, all of which field-tested positively for cocaine. [Trial Tr. 190-91, Nov. 13, 2006; Gov't Exh.

7.]

Inspector Cernelich and his partner, Douglas F. Cislo, ("Cislo"), then sought and obtained

a second warrant from Cuyahoga County Common Pleas Court Judge Nancy M. Russo ("Russo")

to attempt a controlled-delivery of the package to Defendant Alexander's home and search the

premises thereafter. [Gov't Exh. 7.] The Inspectors replaced a portion of the cocaine with a non-

Case No. 1:06-CR-200-002
Gwin, J.

narcotic substitute material and placed an electronic transmitter into the package that would alert

them to the package's opening and the content's removal. [Trial Tr. 191, Nov. 13, 2006.]

On April 6, 2006, a team of officers from the United States Postal Service, the Cleveland

Office of the Drug Enforcement Administration ("DEA"), and Shaker Heights Police Department

effected the search warrant. [Doc. 62.] At approximately 12:02 p.m., Inspector Cernelich delivered

the package to Defendant Alexander's home. *Id.* The defendant's wife, Loretta Alexander, accepted

the package on behalf of Alexander and took it into the residence. *Id.* Ten to fifteen minutes later,

the electronic transmitter sounded, alerting the officers that the package had been opened and the

contents removed. *Id.* The search team entered Alexander's house. *Id.*

Officers immediately placed Loretta Alexander and Defendant Alexander's seventy-six year

old mother face down on the living room floor and handcuffed them. *See, e.g.*, Trial Tr. 158-59,

Nov. 13, 2006. Other officers continued through the living room to search the rest of the house,

including the basement and the second floor. *See, e.g.*, *id.* at 163, 174-75. Initially, the officers

swept and searched the house to secure the premises of danger from other potential occupants.

During their search, the officers found firearms in an upstairs bedroom and cocaine base ("crack")

in the basement. *See, e.g.*, Trial Tr. 176-77, Nov. 13, 2006. The officers' initial search did not

recover the cocaine delivered by Inspector Cernelich in the controlled delivery. *Id.*

As other officers searched the rest of the house, Shaker Heights Police Officer James Ford

("Ford") found Defendant Alexander in the basement and escorted him at gunpoint up the stairs and

into the kitchen. [Trial Tr. 146-49, Nov. 13, 2006.] As Alexander entered the kitchen, a physical

and verbal altercation broke out between Defendant Alexander and DEA Detectives Jamal Ansari

("Ansari") and Joseph Harper ("Harper") who had been securing Alexander's wife and mother. *See,*

Case No. 1:06-CR-200-002
Gwin, J.

*e.g.*, Trial Tr. 107-24, Nov. 13, 2006; Docs. 57, 62.

Alexander first struggled with Harper before Ansari joined the fight. [Trial Tr. 119-20, Nov. 13, 2006.]  Ansari punched and kneed Alexander in the chest and forced him to the floor.  *See, e.g.*, Trial Tr. 103-04, 111, Nov. 13, 2006.  Ansari testified that he does not recall how many times he struck Alexander, but speculated that he may have hit Alexander "15 to 25 times" over a period of "a few moments."  *Id.* at 103-04.  On direct examination, Ansari stated that "I hit Mr. Alexander I can't say how many times but until he was under control I hit him in the chest and kneed him in the chest."  *Id.* at 88.  This testimony is not credible.  Shortly after being subdued, photographs were taken of Alexander's chest. [Def. Exh. C, D.]  Those photographs do not show signs of multiple strikes to Alexander's chest during the initial handcuffing.  *Id.*  Also, Agent Harper gives no testimony supporting Ansari's claim that Ansari struck Alexander multiple times while effecting the handcuffing.[2]  Ultimately, Ansari subdued Alexander and cuffed his hands behind his back.  *Id.* 104, 120.

Ansari then brought Alexander onto the front porch.  *See, e.g.*, Trial Tr. 105-06, Nov. 13, 2006.  Clifford Williams, Alexander's neighbor, testified that he saw Alexander on his porch with Ansari and Cernelich.  *Id.* at 223-28.  Williams testified that, while on the porch, Alexander said

---

[2] Officer Harper testified:

Q.      How long was the struggle?

A.      Not long, not longer than 30 seconds, finally took him down to the ground, got him cuffed
        . . . .

Q.      Did you see or do you know Detective Ansari -- strike that.  Did you see Detective Ansari
        use strikes to the chest to get him to the ground?

A.      No, no.  At that moment when [Alexander] pulled me closer to him, he and I were almost like
        in a hugging position.

[Trial Tr. 120-21, Nov. 13, 2006.]

Case No. 1:06-CR-200-002
Gwin, J.

"treat me like a man" and "I want a lawyer, I want a lawyer." *Id.* at 224.[3/] Ansari did not know that

Williams witnessed his interaction with Alexander on the front porch. *Id.* at 105-06.

Ansari brought Alexander back inside, through the living room where his wife and mother

remained under police guard, and into the kitchen. *Id.* at 80-81, 216. In the kitchen, Ansari "swept

[Alexander's] feet from underneath him" and Alexander lay on the floor with his arms handcuffed

behind his back. *Id.* at 81. Cernelich went upstairs. *Id.* at 216. Apparently alone with Alexander

in the kitchen, Ansari says he orally advised Alexander of his *Miranda* rights and then questioned

him as to the location of the cocaine. *Id.* Ansari testified that Alexander initially refused to

cooperate, but relented once Ansari told him that "if [Alexander] showed us where the narcotics was

that he would be the only person arrested that day." *Id.* at 83. Alexander then "took [Ansari and

the other officers] downstairs and showed [them] where the narcotics were in the ceiling." *Id.* at 84.

Officer Ford testified that, after Alexander showed the police the cocaine's hiding place, he

assisted Alexander in completing a *Miranda* waiver form. *Id.* at 151-52. Ford gave the completed

form to the "postal inspectors" responsible for the search. *Id.* at 180. Contrary to this testimony,

Postal Inspector Cernelich testified that he did not receive Alexander's signed *Miranda* waiver from

the Shaker Heights Police Department and that the file for this case, maintained by Cernelich, does

not contain such a form. *Id.* at 231-32.

## II.  Legal Standard

The Fourth Amendment guarantees

> [t]he right of the people to be secure in their persons, houses, papers,

---

[3/]  Ansari testified that he did not see Williams or anyone else while on the front porch with Alexander. [Trial Tr. 106, Nov. 13, 2006.] Ansari denied that Alexander ever requested a lawyer during his entire interaction with him. *Id.* at 87. Cernelich made a similar denial. *Id.* at 197.

Case No. 1:06-CR-200-002
Gwin, J.

> and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

A search is a governmental invasion of a person's privacy. *Oliver v. United States*, 466 U.S. 170, 177-78 (1984). A legitimate privacy interest exists where an individual has an objectively reasonable subjective expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 361 (1967). The Fourth Amendment does not protect items exposed to the public because an individual does not have a legitimate expectation of privacy in those items. *Katz,* 389 U.S. at 351.

Authorities may lawfully detain a package within the United States Postal System so long as they have reasonable suspicion that the package involves criminal activity. *United States v. Van Leeuwen*, 397 U.S. 249 (1970). "Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant" the detention of the package for investigation. *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001). Similar to the *Terry* doctrine, a package's external characteristics can create the constitutional basis for its lawful detention. *United States v. Underwood*, 1996 U.S. App. LEXIS 24995 (6th Cir. Sept. 20, 1996).

The external characteristics appropriately considered by a court in determining a parcel's suspicious nature include, *inter alia*, (i) its size and shape; (ii) the appearance of the mailing label as hand-written or typed; (iii) the validity of the return address; (iv) the origination or destination cities as "source" locations for drug trafficking or other criminal activity; and, (v) unusual odor. *Underwood*, 1996 U.S. App. LEXIS 24995, at *8-9. With regard to the last characteristic, the performance of a "sniff test" by a drug dog represents a minimal intrusion and, therefore, does not constitute a search. *See United States v. Place*, 462 U.S. 696, 707 (1983).

-7-

Case No. 1:06-CR-200-002
Gwin, J.

Once authorities have reasonable suspicion that a mailed package involves criminal activity, they may obtain a search warrant for its contents from a detached magistrate by demonstrating probable cause to do so.  Probable cause exists where, under the totality of the circumstances, the information properly before the magistrate provides a "substantial basis for . . . concluding that a search would uncover evidence of wrongdoing . . . ." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quotation omitted).  To establish probable cause, the authorities' supporting affidavit must recite facts and circumstances indicating "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990) (citation omitted).  A reviewing court need merely "determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984).  A "facially valid" warrant is operative even where an affidavit may be insufficient to establish probable cause if the police act in good faith reliance on the warrant. *United States v. Leon*, 468 U.S. 897, 925-26 (1984).

The Fifth Amendment prohibits authorities from compelling any person "in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  Consistent with the Fifth Amendment's privilege against self-incrimination, a suspect may not be subject to a custodial interrogation until after being advised of his *Miranda* rights. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).  Custodial interrogation includes "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A suspect may invoke the right to remain silent or the right to counsel either prior to or during interrogation. *Id.* at 473-74.  The police must then cease all questioning. *Id.*  A defendant's invocation of the right to counsel bars further interrogation

Case No. 1:06-CR-200-002
Gwin, J.

without counsel "unless the accused himself initiates further communication, exchanges, or conversations with police," and subsequent events indicate that the suspect waived the right to counsel. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). A *Miranda* waiver must be voluntary, knowing, and intelligent, factors determined by the Court after considering the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991). The Government must prove the voluntariness of a waiver by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 482-84 (1972).

Under the Exclusionary Rule, a defendant may move to suppress items obtained pursuant to an unconstitutional search or seizure as fruit of the poisonous tree. *Weeks v. United States*, 232 U.S. 383, 398 (1914). *See also Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). The "inevitable discovery" exception to the Exclusionary Rule admits otherwise unlawfully obtained evidence if the police would have "inevitably discovered" the evidence during the course of their search. *Nix v. Williams*, 467 U.S. 431, 444 (1984). The inevitable discovery exception applies "when the government can establish either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).

The Sixth Circuit has adopted a three-part test to determine the admissibility of impermissibly seized evidence under the inevitable discovery exception, including

> (i) a reasonable probability that the evidence in question would have been discovered by lawful means but for the police misconduct; (ii) that the police possessed the leads making the discovery inevitable at the time of the misconduct; and, (iii) the active pursuit by the police of an alternate line of investigation prior to the misconduct.

-9-

Case No. 1:06-CR-200-002
Gwin, J.

*See United States v. Buchanan*, 904 F.2d 349, 356-57 (6th Cir. 1990).

Within the Sixth Circuit, the inevitable discovery exception applies even to contraband seized in the absence of a *Miranda* warning and after police coercion, so long as the police act pursuant to a valid search warrant. *United States v. Norman*, 1997 U.S. App. LEXIS 13122 (6th Cir. June 2, 1997). In *Norman*, the police searched the defendant's home for drugs pursuant to a valid search warrant. 1997 U.S. App. LEXIS 13122, at *2-3. The search uncovered two guns and cocaine, which formed the basis of the Government's subsequent indictment of the defendant. *Id.* at *4. The defendant moved to suppress the evidence as the result of an illegal search and coerced confession. *Id.* The district court denied the defendant's suppression motion, the defendant pled guilty, and the court convicted him. *Id.* The defendant then appealed the district court's denial of his motion to suppress. *Id.* On appeal, the Sixth Circuit applied the reasoning of *Kennedy*, 61 F.3d at 499, and held that the

> police already had a valid search warrant for [the subject premises] before they allegedly coerced Defendant, and they found the [contraband] in places that police typically search. Thus, it was 'reasonably probable' that the police would have found the drugs. Further, the police obtained the search warrant and began to execute it before the alleged misconduct occurred. Therefore, even if the police coerced Defendant into disclosing the location of the drugs, the police would have inevitably found them.

*Norman*, 1997 U.S. App. LEXIS 13122, at *8-9. The Southern District of Ohio has adopted the Sixth Circuit's *Norman* reasoning. *See United States v. Charbonneau*, 979 F. Supp. 1177, 1187 (S.D. Ohio Sept. 30, 1997).

### III. Analysis

The facts of this case implicate three constitutional issues, which, when considered under Supreme Court precedent and Sixth Circuit case law, result in the Court's denial of Alexander's

-10-

Case No. 1:06-CR-200-002
Gwin, J.

motion to suppress.  The first issue addresses the Fourth Amendment's requirement that Detective

Cook and Inspector Cernelich had reasonable suspicion that Alexander's package was involved in

criminal activity to justify removing it from the Postal Service's mail line.  The second question

involves Alexander's *Miranda* rights and the tactics employed by Detective Ansari to coerce

Alexander's cooperation in assisting the police in their search of his home.  Finally, the third issue

examines the Exclusionary Rule and its "inevitable discovery" exception as it relates to the police's

recovery of the cocaine that Alexander received through the controlled-delivery and then hid in his

basement.

Applying the established law to the instant facts, the Court concludes that, despite Ansari's

aggressive behavior and the search team's apparent disregard for Alexander's *Miranda* rights, it

cannot suppress the evidence against Alexander because the police officers acted under a valid

search warrant and, using established procedure, would have "inevitably discovered" the cocaine

in the basement.

### A.  Defendant Alexander's Fourth Amendment Claim

Based on the testimony of Detective Cook and Inspector Cernelich, the Court agrees that the

external characteristics of the package coming from "Thomas & McKenzie Financial" in Las Vegas,

Nevada to "Mr. Alexander" in Shaker Heights, Ohio created reasonable suspicion for Cook to detain

the package, a detention that gave probable cause to the inspectors to obtain a search warrant.  This

case's "specific and articulable facts," and rational inferences from those facts, include the hand-

written label, apparent falsity of the return address within the database of the United States Postal

System, and the weight and density of the package particularly given its purported origination from

a financial institution.  The Court also finds the lack of telephone contact numbers for the sender and

-11-

Case No. 1:06-CR-200-002
Gwin, J.

recipient contributes to the package's suspicious nature.

These characteristics combine to defeat Defendant Alexander's overly-general argument that the package's "size and appearance was identical to every other U.S. Postal Service Express mail shipping box that is shipped in U.S. mail." Further, Alexander overlooks the fact that the Fourth Amendment protects legitimate privacy interests, which do not include items exposed to the public. *See Katz*, 389 U.S. at 351. Briefly detaining the package from the public mail flow, Detective Cook lawfully subjected it to a "sniff test" by his canine partner. *See Place*, 462 U.S. at 707. The detention of the package and the sniff test did not otherwise delay the delivery of the package. Thereafter, the postal inspectors employed established police procedure to apply for and obtain valid search warrants from Magistrate Judge Vecchiarelli and Cuyahoga County Judge Russo to examine the package's contents and attempt a controlled-delivery to Alexander's home.[4] Taken together, these police procedures do not violate Alexander's constitutional rights against unreasonable search and seizure.

The Court credits the experience and expertise of Detective Cook and Inspector Cernelich in identifying the package as suspect, obtaining a valid search warrant based on probable cause, and investigating its contents. Thus, the authorities had reasonable suspicion to seize the package, obtain a warrant to search its contents, and obtain a second warrant to search Alexander's home if the package was accepted in a controlled-delivery. As a result, the postal authorities did not violate Defendant Alexander's Fourth Amendment rights.

---

[4] Here, as in *Leon*, 468 U.S. at 920, nothing suggests that the affidavits supporting the search warrants for the package or the residence contained deliberately false statements or statements made in reckless disregard for the truth. While Alexander challenges the initial detention of the package, he does not challenge the subsequent search of the package at the postal facility. Further, Alexander challenges the use of his statements pointing the officers to the cocaine in his ceiling, but he does not challenge the validity of the search warrant issued by Common Pleas Judge Russo.

-12-

Case No. 1:06-CR-200-002
Gwin, J.

### B.  Defendant Alexander's Fifth Amendment Claim

While the detective and inspectors did not violate Alexander's Fourth Amendment right against impermissible search and seizure, the Court finds that Detective Ansari and the other members of the search team violated Alexander's Fifth Amendment right against self-incrimination.

Defendant Alexander contends that the police violated his constitutional right against involuntary confession.  In his motion to suppress and at the suppression hearing, Alexander presented explicit allegations and vivid testimony that Detective Ansari subjected him to harsh treatment during a custodial interrogation that began almost immediately after the police entered Alexander's home.  Ansari admits that he "hit Mr. Alexander [he] can't say how many times but until he was under control [he] hit him in the chest and kneed him in the chest."  Ansari also admits threatening Alexander with the arrest of his wife and mother unless Alexander cooperated and told the officers where he hid the cocaine.  Ansari and all the other members of the search team insist that Alexander never requested a lawyer throughout the entire search and upon his arrest.  In fact, the police say that Alexander provided them with a written *Miranda* waiver, although they cannot produce the actual form.

Alexander and his witnesses tell a different story.  According to Defendant Alexander, he repeatedly stated "I want a lawyer" and the officers ignored his request.  Alexander's wife corroborated Alexander's testimony.  Clifford Williams, the defendant's neighbor, testified that Alexander told Ansari "I want a lawyer" on Alexander's front porch.  After observing his demeanor, the Court finds Neighbor Williams's testimony the most credible.

Consequently, the Court finds that Ansari should have immediately ceased interrogating Alexander while Alexander was on the front porch.  But, Ansari did not.  Instead, Ansari brought

Case No. 1:06-CR-200-002
Gwin, J.

Alexander back into the kitchen where he impermissibly continued his interrogation.  Under

Ansari's continued pressure, Alexander ultimately led the police to the cocaine hidden in the

basement's ceiling.

The fact that Ansari may have orally informed Alexander of his Miranda rights after their

encounter on the front porch is irrelevant.  Equally irrelevant is any written *Miranda* waiver by

Alexander not only because he purportedly completed it after requesting a lawyer and directing

police to the contraband cocaine, but also because the totality of the circumstances do not indicate

that Alexander entered into any such waiver voluntarily.  Perhaps Officer Ford did not intimidate

Alexander in the same manner as Detective Ansari, but the Court finds that the search team

impermissibly obtained Alexander's cooperation by overbearing his will.  The officers' conduct in

pressuring Alexander and the defendant's capacity to resist that pressure void any *Miranda* waiver,

if one exists at all, by Alexander.

The law unequivocally requires that the police  stop questioning a defendant who has

invoked his Fifth Amendment right to counsel, "unless the accused himself initiates further

communication" with the authorities.  *Bradshaw*, 462 U.S. at 1045-46.  Ansari, a twenty-two year

veteran with the Cleveland Police Department and DEA, flouted the law when he continued

questioning Alexander after his request for a lawyer.  As such, Defendant Alexander correctly

contends that the police violated his Fifth Amendment rights during their April 6, 2006 search of

his home.

### C.  The Inevitable Discovery of the Cocaine in Alexander's Home

Typically, the Exclusionary Rule bars evidence seized by police in violation of a defendant's

rights under the Fourth, Fifth, or Sixth Amendments.  The Rule suppresses impermissibly-obtained

Case No. 1:06-CR-200-002
Gwin, J.

confessions and evidence as fruit of the poisonous tree.  *See, e.g.*, *Silverthorne*, 251 U.S. at 392.  In

this case, the Ansari's violation of Alexander's Fifth Amendment right to counsel represents the

"poisonous tree;" the cocaine recovered from Alexander's basement represents the "fruit."

Generally, because the police coerced Alexander's cooperation in locating the cocaine after ignoring

his request for a lawyer, the Court would suppress the drugs as evidence against Alexander in the

Government's case against him.

However, the Government argues that the "inevitable discovery" exception to the

Exclusionary Rule should apply to allow admission of the seized cocaine as evidence of Alexander's

culpability in the charged drug crimes.  The Government requests the Court to admit its illegally-

obtained evidence because the police would have "inevitably discovered" the cocaine through

independent, lawful means.  The Government says that the police had just initiated a comprehensive

search of Alexander's house at the time of Ansari's illegal coercion of Alexander.  Eventually and

inevitably, the Government argues, the police would have discovered the cocaine.

Defendant Alexander disagrees.  Alexander says that the Government did not and cannot

prove that the search team would have inevitably discovered the cocaine hidden in the basement

ceiling.  Alexander contends that, as a matter of law, the Government cannot invoke the inevitable

discovery exception in this case because the police obtained the evidence by beating Alexander until

he revealed the cocaine's location.  Alexander stresses that "the severity and intentionality of the

government's constitutional violation is one of the factors this Court must consider when applying

the inevitable discovery rule."  Alexander concludes that the Court should grant his motion to

suppress the cocaine as evidence in the Government's case against him.

The Court has considered Defendant Alexander's canvass of case law from across the

Case No. 1:06-CR-200-002
Gwin, J.

circuits and various district courts regarding the Exclusionary Rule and the inevitable discovery

exception.  However, the Sixth Circuit's established law binds the Court in this instance and requires

admission of the evidence if the Government satisfies *Buchanan*'s three-part test, even in the face

of Ansari and the other officers' violation of Alexander's Fifth Amendment rights.

The facts in the instant case closely mirror those in *Buchanan*, *Norman*, and *Charbonneau*.

Based on reasonable suspicion and probable case, Inspectors Cernelich and Cislo sought and

obtained valid search warrants to investigate the contents of the package addressed from "Thomas

& McKenzie Financial" and attempt a controlled-delivery of a surveillance parcel to Alexander's

home.  Alexander's wife accepted the package, which she took into the home.  Law enforcement

surrounded the house and stopped anyone leaving the area of the house.  Within fifteen minutes, the

package's electronic surveillance device alerted the police that someone had opened the package and

removed its contents.  The police entered Alexander's home, secured the premises, and began a

general search for the cocaine throughout the entire house.

The Government's witnesses testified to their confidence that Alexander hid the cocaine

somewhere in his house.  Cernelich and other members of the search team credibly testified that they

would have discovered the cocaine through a systematic police search of the premises, including

taking apart the basement ceiling and the use of drug dogs.  The Court finds that the Government

satisfied *Buchanan*'s three-part test: it demonstrated that the police reasonably would have

discovered the cocaine by lawful means, but-for Ansari's misconduct; the police possessed leads

making the cocaine's discovery inevitable when Ansari impermissibly coerced Alexander's

cooperation; and, the search was underway at the time of Ansari's violation of Alexander's *Miranda*

rights.  Based on this testimony and the facts of the case, the Court finds that the search team would

-16-

Case No. 1:06-CR-200-002
Gwin, J.

have "inevitably discovered" the cocaine in Alexander's basement.  Thus, the Court will not

suppress the evidence as requested by Defendant Alexander.

IV.  Conclusion

For these reasons, the Court **DENIES** Defendant Alexander's motion to suppress.

IT IS SO ORDERED.


Dated: November 20, 2006                    s/            *James S. Gwin*
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE